**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 25-10511
Non-Argument Calendar
_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

MICHAEL MONTEITH,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:05-cr-20777-JEM-1

_____

Before JILL PRYOR, BRANCH, and HULL, Circuit Judges.

PER CURIAM:

After a jury trial, defendant Michael Monteith appeals his conviction and sentence for conspiring to import cocaine into the United States in violation of 21 U.S.C. §§ 952(a), 963. Monteith

challenges (1) the district court's decision to resume and finish trial in his absence; (2) the application of a two-level increase to his offense level for obstruction under U.S.S.G. § 3C1.1; and (3) the substantive reasonableness of his 108-month prison sentence.

After careful review, we affirm Monteith's conviction and sentence.

## I. INDICTMENT, TRIAL, AND ABSENCE

### A.    2005 Indictment and 2010 Arrest

In 2005, a grand jury in the Southern District of Florida indicted Monteith on four counts: (1) conspiracy to import cocaine and heroin into the United States, in violation of 21 U.S.C. §§ 952(a), 963; (2) conspiracy to possess with intent to distribute cocaine and heroin, in violation of 21 U.S.C. §§ 841(a)(1), 846; (3) aiding and abetting the importation of cocaine and heroin into the United States, in violation of 21 U.S.C. § 952(a), 18 U.S.C. § 2; and (4) aiding and abetting the possession of cocaine and heroin with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), 18 U.S.C. § 2. All counts alleged the offense involved 500 grams or more of a mixture and substance containing cocaine and 1 kilogram or more of a mixture and substance containing heroin.

The district court issued a warrant for Monteith's arrest. As of January 2006, Monteith was in fugitive status, and he was not arrested until January 2010. Monteith pleaded not guilty and proceeded to trial.

### B.    Jury Selection on April 12, 2010

On April 12, 2010, Monteith's trial began in Miami, Florida. Monteith attended the first trial day, during which the jury was selected and given preliminary instructions. Before adjourning, the district court told the attorneys, jurors, and Monteith that trial would resume at 10 a.m. the next day.

### C.    Monteith's Absence on April 13, 2010

On April 13, 2010, the district court began at 10:23 a.m. Monteith was not present. Monteith's counsel told the court he had called Monteith eight times that morning, had not heard from Monteith since the prior day, and had not received any indication that Monteith was unable to attend trial.

The district court remarked that Monteith's case was an "old case," and asked the government to explain the cause for the delay and its relation, if any, to Monteith's absence. The government explained that, when agents initially attempted to arrest Monteith in 2006, they encountered Monteith's wife. Monteith's wife informed the agents that Monteith was not home and that she had not seen him in multiple months. The agents left a contact card with Monteith's wife.

Later in 2006, Monteith called the agents and said he was living in New York. The agents informed Monteith of the arrest warrant and asked him to surrender. Monteith refused to tell the agents exactly where he was located, and he never surrendered. In January 2006, Monteith was transferred to fugitive status.

In late 2009, Immigration and Customs Enforcement ("ICE") learned Monteith was in the Atlanta area. On January 4, 2010, U.S. Marshals arrested Monteith in Decatur, Georgia. After being released on bond, Monteith appeared for pretrial proceedings in the Southern District of Florida.

Thus informed, the district court stated it could proceed to trial in Monteith's voluntary absence, but would excuse the jurors until noon, at which time opening statements would begin whether Monteith appeared or not. Neither party objected to the proposal.

Before the recess, the government asked the court or Monteith's attorney whether it could make clear that Monteith was informed that his presence at trial that day was required. The district court responded: "Well, I told him. I mean, he was here when I said yesterday afternoon that we were going to resume at 10 a.m. this morning. He was in the courtroom present." Monteith's attorney agreed and informed the district court he had directed Monteith to be present by 9:30 a.m.

The district court again proposed to proceed with trial at noon. The district court observed that, even if the trial was rescheduled, it did not have any indication that Monteith would appear "since it took five years to get him the first time."

The district court called a recess at 10:31 a.m.

## D.    Resuming Trial on April 13, 2010

At 12:02 p.m., the district court reconvened.

The government advised that it had spoken with Monteith's girlfriend, who was present in court the first day of trial and co-signed Monteith's bond. Monteith's girlfriend drove Monteith to Miami for trial but had not spoken with him since the prior afternoon, April 12. She had returned to Georgia.

The government recounted that it spoke with Monteith's Atlanta-based probation officer. The probation officer said he spoke with Monteith the prior morning, April 12. Monteith said that his electronic monitoring device's battery was running low and he did not have his charger. The Georgia probation officer directed Monteith to either contact Miami pretrial services for a charger or to purchase a charger.

Monteith, however, did not contact anyone to obtain a charger and his monitoring device went offline on April 12 around 3:00 p.m. at a Fort Lauderdale Publix store. The Atlanta probation officer was "very apologetic," but highlighted how unexpected Monteith's conduct was considering his previous full compliance with his pretrial release terms.

The district court added that it contacted Monteith's Miami-based pretrial probation officer during the break. That probation officer called the hotel Monteith reported staying at during his trial. The hotel was reluctant to provide the probation officer any information, but implied that Monteith was not registered as a guest under his name.

The district court asked the government about its witnesses. The government had five witnesses present in the

courtroom—ICE Special Agents Thomas Doolittle and Thomas Cadwallader from Atlanta, Georgia; Drug Enforcement Administration ("DEA") Forensic Chemist Angel Ramirez from Dallas, Texas; and two additional ICE Special Agents, Matt Leary and Daniel Evans, both local to Miami. The government also planned to call Monteith's co-conspirator, Patricia Mays, who was in Miami on a writ of habeas corpus ad testificandum from the Middle District of Georgia.

The district court then asked defense counsel for his position. Monteith's counsel said that he wished to "stop the trial at this minute." Monteith's attorney stated that he had made further attempts to contact Monteith but to no avail.

The district court decided to resume the trial, finding that "the cost of delay clearly outweigh[s] the interest of the defendant when he voluntarily absents himself from the courtroom." Considering Monteith's prior fugitive status, the district court found it "very likely that he has absconded." The district court could discern no reason for Monteith's absence and recounted how (1) Monteith knew trial was set to resume at 10:00 a.m. that day; (2) numerous attempts to contact Monteith were unsuccessful; and (3) the jury and court were ready to proceed.

During its findings, the district court also speculated that it could declare a mistrial should Monteith's absence be discovered to be involuntary. The district court said, "[I]f I'm wrong and the defendant shows up in a hospital tomorrow, I can always declare a mistrial, but I don't think that's going to happen."

The government then asked whether the court was finding both that Monteith was voluntarily absent and that it was in the public interest to proceed. The court responded in the affirmative and stated "[t]hat the cost of delay clearly outweigh[s] the interest of the defendant and society."

The government then cited *United States v. Bradford*, 237 F.3d 1306, 1313 (11th Cir. 2001), which provides "a nonexhaustive list of factors" for determining whether to proceed in absentia. The district court responded that it believed it had considered the relevant factors "by stating that most of the witnesses traveled here from elsewhere for the purpose of being witnesses in this case." The district court repeated that it did not "think that there's any question that the absence is voluntary at this point."

The district court then called the jury back to the courtroom so the lawyers could present opening arguments and Monteith's trial could proceed.[1]

## II.  TRIAL EVIDENCE ON APRIL 13, 2010

### A.    Patricia Mays

The government's first witness was Patricia Mays, who testified as follows.

---

[1] Before the jury returned, the district court asked Monteith's attorney whether the defense wanted the jury to be provided with any instruction regarding Monteith's absence, but Monteith's attorney asked the district court to not provide such an instruction.

Mays was known by many as "Fly." As of 2002, Mays lived in Lilburn, Georgia, working as a vice president at a record label and as owner of her trucking company, "Fly's Transportation." When business slowed and she struggled financially, Mays explored other ways to earn money.

A friend referred Mays to a man named "Mike," who was later identified as the defendant Monteith. In late 2002, Mays met Mike in a parking lot of a Decatur, Georgia, shopping center. Mike told Mays she could be paid $10,000 to $15,000 for helping his sister, Jackie, smuggle drugs into the country from Aruba. Mike explained that Mays would have to strap drugs to her thighs and carry the concealed contraband back aboard cruise lines operating in the Caribbean. Mike and Mays stayed in contact following their meeting.

Eventually, Mike arranged a meeting between himself, his sister Jackie, and Mays. The three discussed details of an upcoming cruise and how Mays and her friend, Eunice Stewart, would carry out the drug smuggling plan. Mike and Jackie instructed Mays that she should (1) book a cruise for which Mike and Jackie would reimburse Mays; (2) wear loose-fitting clothing to conceal contraband; and (3) meet Jackie in a McDonalds near the cruise port in Aruba to receive drugs.

Mays then recounted her trip. Mays and Stewart boarded a two-week Celebrity cruise out of Fort Lauderdale, Florida. The final port of call was in Aruba. There, Mays and Stewart went to a nearby McDonalds as directed. A man who identified himself as

Jackie's brother met the two women and provided them with drugs that he strapped to their thighs. Mays testified that it was her understanding that she was supposed to bring the drugs back to the United States and give them to Mike.

On December 20, 2002, Mays and Stewart were arrested as they disembarked from the cruise when a drug dog alerted to the drugs they carried.

### B.    ICE Special Agent Matthew Leary

The government's next witness was ICE Special Agent Matthew Leary, who responded to the scene of Mays and Stewart's arrest. Leary testified that he observed Mays and Stewart with suspected narcotics strapped to their legs. Leary transported the suspected narcotics to a DEA lab for testing.

On January 24, 2003, Special Agent Leary interviewed Mays at the Fort Lauderdale jail. Similar to her testimony at trial, Mays told Leary about being introduced to Mike, meeting with Mike and Jackie, and the formation of the smuggling plan. Mays also told Leary that she complained to Mike about not having enough money for her trip and that Mike arranged for others to wire her $600.

A year after his initial interview of Mays, Special Agent Leary showed Mays a photo of Monteith. Mays identified the person depicted as Mike.

## C.    Forensic Chemist Angel Ramirez

The government's next witness was Angel Ramirez, a forensic chemist at a DEA laboratory in Dallas. In 2002, Ramirez worked in a DEA laboratory in Miami and received four packages of contraband from Special Agent Leary. Ramirez testified that his testing showed the packages collectively contained (1) 2,550.7 grams, or about 2.5 kilograms, of cocaine; (2) 4.8 grams of marijuana; and (3) 1,004 grams, or about 1 kilogram, of heroin.[2]

## D.    ICE Special Agent Daniel Evans

The government also called Special Agent Daniel Evans, who began investigating Patricia Mays as part of a larger investigation of an organization led by Jamaican nationals that smuggled drugs into south Florida using passengers on cruise ships.

Special Agent Evans interviewed Mays in February and April of 2005. As she had told Special Agent Leary, Mays told Evans that Mike proposed the cruise-based drug smuggling to her and set up a meeting between himself, Mays, and Jackie. And Mays again identified a picture of Monteith as the man she knew as Mike.

In July 2005, Special Agent Evans sought to interview Monteith. Evans and two other agents traveled to Monteith's home in Decatur, Georgia. Monteith's wife answered the door and said Monteith was not home. As the agents walked back to their vehicles, they noticed a red work truck, tools, and work boots

---

[2] At trial, Mays denied knowing the drugs she received in Aruba contained heroin but acknowledged she pled guilty to possession of heroin.

nearby. The agents called in the work truck's license plate and were informed that the truck belonged to Monteith. Believing that Monteith was in fact home, the agents returned to the house, were again greeted by Monteith's wife, and insisted they needed to speak to Monteith. The agents were allowed into the house, at which time Monteith came down from the second floor.

Evans proceeded to interview Monteith. During the interview, Monteith acknowledged he knew Jackie and had last seen her around 2002. Monteith said that, around that time, Jackie was looking for women to smuggle drugs into the United States as passengers on a cruise ship. Monteith admitted he talked to Mays, whom he knew as "Fly," and got her to agree to going on a cruise to smuggle drugs. Monteith further admitted to arranging a meeting between Jackie and Mays but said that he remained outside the room while Jackie and Mays had a conversation.

### E.    ICE Special Agent Thomas Doolittle

The government called Special Agent Thomas Doolittle, who testified about a failed attempt to arrest Monteith. In January 2006, Doolittle traveled to Monteith's home in Decatur to carry out an arrest warrant. Monteith's wife permitted Doolittle to enter the home, but he failed to find Monteith. Doolittle left his office's contact information with Monteith's wife.

Special Agent Doolittle also called a phone number associated with Monteith, but a woman answered and claimed to be Monteith's sister. Later the same day, Doolittle received a call from Monteith, who informed Doolittle he was in Brooklyn, New

York. Doolittle told Monteith to provide his address or report to the ICE office in Atlanta. Monteith refused both requests.

### F.    ICE Special Agent Thomas Cadwallader

Special Agent Thomas Cadwallader testified that, in 2010, he received information indicating Monteith was back in the Atlanta area. Cadwallader surveilled Monteith's home for several months and, along with other agents, eventually arrested Monteith on January 4, 2010.

### G.    ICE Special Agent Sean Stone and Deputy U.S. Marshal Michael Witkowski

Because Monteith's absence did not allow for an in-court identification, the government called two witnesses to show Monteith or the "Mike" described in all other testimony was in fact defendant Monteith. Special Agent Sean Stone testified that he saw Monteith at the defense table the previous day. Stone then testified that a photo that other witnesses had said depicted Mike showed defendant Monteith—the same person he observed in court the previous day.

Deputy U.S. Marshal Michael Witkowski reviewed records showing Monteith entered the courthouse the previous day.

### H.    Close of Evidence

After its final witness, the government introduced Monteith's prior conviction for possession with intent to distribute marijuana. *See* Fed. R. Evid. 404(b). The government rested. Monteith's attorney moved for a judgment of acquittal, which the

district court denied. The defense rested without presenting any evidence.

### III.  END OF TRIAL AND VERDICT ON APRIL 14, 2010

On April 14, 2010, trial continued for a third day. Once again, Monteith did not appear.

Outside the presence of the jury, the district court informed the attorneys that the pretrial services officer had interviewed Monteith's wife. Monteith's wife reported that Monteith called her around 1 a.m. on April 13—the morning of the second day of trial—and said he was "very nervous about the trial." But Monteith's wife did not know his whereabouts.

After a charging conference, the attorneys presented closing arguments, and the district court charged the jury.

The jury found Monteith guilty of Count 1's charge of conspiring to import controlled substances into the United States. Although Count 1 charged a conspiracy to import cocaine and heroin, the jury specifically found Monteith guilty of conspiring to import cocaine only. The jury specifically found Monteith conspired to import between 500 grams and 5 kilograms of cocaine. The jury did not find Monteith responsible for any amount of heroin.

The jury found Monteith not guilty on all other counts.

### IV.  SENTENCING ON FEBRUARY 3, 2025

Over fourteen years after his trial, Monteith was arrested on September 5, 2024. A probation officer was assigned to prepare a

presentence investigation report ("PSI"), and the district court scheduled a sentencing hearing.

## A.    PSI

A probation officer prepared a PSI using the 2024 Sentencing Guidelines manual. The PSI calculated a total offense level of 32, consisting of: (1) a base offense level of 26 because the offense involved at least 2 kilograms but less than 3.5 kilograms of cocaine, pursuant to U.S.S.G. § 2D1.1(a)(5); (2) a four-level increase for Monteith's role as an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive, pursuant to U.S.S.G. § 3B1.1(a); and (3) a two-level increase for obstructing or impeding the administration of justice with respect to the investigation, prosecution, or sentencing of his offense, pursuant to U.S.S.G. § 3C1.1.

With a total offense level of 32 and a criminal history category of II, the PSI calculated Monteith's advisory guidelines range to be 135 to 168 months of imprisonment.

## B.    Monteith's Objections to the PSI

As relevant here, Monteith objected to the PSI's application of the four-level role increase under U.S.S.G. § 3B1.1(a). Monteith contended that the government had not shown Monteith "exercised the required level of control or authority over anyone" to qualify as an organizer or leader of the smuggling conspiracy.

Monteith also objected to the PSI's application of the two-level increase for obstruction of justice under U.S.S.G. § 3C1.1.

Monteith argued that "[h]is absence after jury selection was not in contravention of any court order, and it did not have the intent or effect of obstructing any proceedings." Monteith further argued that his "trial proceeded and concluded, without issue, in his absence."

## C.    Government's Response to Objections

In its written response, the government stated it was not pursuing a role increase under § 3B1.1(a) and conceded that Monteith "did not have any meaningful supervisory, managerial, or organizational role over any other participant."

The government maintained that the PSI properly applied a two-level obstruction increase under § 3C1.1. The government cited commentary to § 3C1.1 that set forth examples of conduct to which the increase should apply, including "willfully failing to appear, as ordered for a judicial proceeding." *See* U.S.S.G. § 3C1.1 cmt. n.4(E). The government highlighted Monteith's absence from the second trial day and his continued absence until his arrest fourteen years later.

## D.    Sentencing Hearing

On February 3, 2025, the district court held a sentencing hearing.

The district court accepted the parties' position that the four-level role increase did not apply. But the district court overruled Monteith's objection to application of a two-level obstruction of justice increase under § 3C1.1. The district court

relied on Monteith's decision to "leave in the middle of a trial and require the case to be tried in absentia."

The district court recalculated Monteith's total offense level to be 28. Monteith's total offense level of 28 and criminal history category of II yielded a new advisory guidelines range of 87 to 108 months of imprisonment.

The district court elicited the parties' positions on an appropriate sentence. The government posited that Monteith's mid-trial absence and fourteen years as a fugitive demonstrated a "complete lack of respect to th[e] [c]ourt and for the law." The government recommended a high-end, 108-month sentence.

Monteith's counsel acknowledged that "Monteith made an incredibly poor choice in not returning for trial." But Monteith's attorney highlighted (1) mitigating factors, including Monteith's age, declining health, and recent employment record; and (2) that Mays, Monteith's co-conspirator, received a 70-month sentence. Monteith's attorney recommended a low-end, 87-month sentence. Monteith briefly allocuted, during which he apologized, accepted responsibility for his actions, and asked for mercy.

Ultimately, the district court sentenced Monteith to 108 months of imprisonment. Monteith timely appealed.

## V.  STANDARDS OF REVIEW

This court reviews "a district court's decision to proceed with trial in a defendant's absence only for abuse of discretion." *Bradford*, 237 at 1312. In doing so, we first review a district court's

factual findings as to whether a defendant's absence was voluntary for clear error. *Id.* at 1311. We then "consider whether the court abused its discretion in concluding that there was on balance a controlling public interest to continue the trial in the defendant's absence." *Id.*

"We review *de novo* the interpretation and application of the Sentencing Guidelines." *United States v. Kluge*, 147 F.4th 1291, 1296 (11th Cir. 2025) (quoting *United States v. Dupree*, 57 F.4th 1269, 1272 (11th Cir. 2023) (en banc)). The district court's fact findings at sentencing are reviewed under the clearly erroneous standard. *United States v. Bergman*, 852 F.3d 1046, 1070 (11th Cir. 2017).

We will reverse a sentence as "substantively unreasonable" only if the district court committed an abuse of discretion in imposing the sentence. *United States v. Pugh*, 515 F.3d 1179, 1191 (11th Cir. 2008).

## VI.  TRIAL IN ABSENTIA

On appeal, Monteith argues the district court's decision to proceed with trial in his absence violated his constitutional and statutory rights to be present for those proceedings.

### A.      General Principles

"The right to be present during one's trial arises from the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fifth Amendment, and is codified at Rule 43 of the Federal Rules of Criminal Procedure." *United States v.*

*Brantley*, 68 F.3d 1283, 1290-91 (11th Cir. 1995).[3] A defendant's right to be present for trial, however, can be waived by the defendant's voluntary absence from trial. *Id.*; *Taylor v. United States*, 414 U.S. 17, 18-19 (1973).

Our analysis proceeds in two steps. First, we determine whether the district court clearly erred when it found Monteith was "voluntarily absent[]" from his trial. *Bradford*, 237 F.3d at 1311 (Rule 43 claim); *United States v. Novaton*, 271 F.3d 968, 996 (11th Cir. 2001) (Rule 43 and constitutional claims). Second, we "consider whether the court abused its discretion in concluding that there was on balance a controlling public interest to continue the trial in the defendant's absence." *Bradford*, 237 F.3d at 1311; *Novaton*, 271 F.3d at 996.[4]

---

[3] For its part, Federal Rule of Criminal Procedure 43 provides that "the defendant must be present at . . . every trial stage, including jury impanelment and the return of the verdict." Fed. R. Crim. P. 43(a). But a defendant "who was initially present at trial, . . . waives the right to be present . . . when the defendant is voluntarily absent after the trial has begun, regardless of whether the court informed the defendant of an obligation to remain during trial." *Id.* R. 43(c)(1). Lastly, "[i]f the defendant waives the right to be present, the trial may proceed to completion, including the verdict's return and sentencing, during the defendant's absence." *Id.* R. 43(c)(2).

[4] This Court has "declined to determine the extent to which the rule and the constitutional sources of the right to be present overlap." *Novaton*, 271 F.3d at 998 (citing *United States v. Boyd*, 131 F.3d 951, 953 n.3 (11th Cir. 1997)). We need not determine the issue today either, since we conclude Monteith's voluntary absence constituted a waiver of his right to be present during trial, whether constitutional or statutory.

25-10511                Opinion of the Court                19

## B.    Voluntary Absence

For several reasons, the district court did not clearly err when it found Monteith was voluntarily absent on the second and third days of his trial. As of April 13, 2010, Monteith's absence was itself supportive of that finding, since the district court expressly informed Monteith his trial would continue that day at 10 a.m., and Monteith failed to appear with no apparent reason for his absence. *See United States v. Benavides*, 596 F.2d 137, 139 (5th Cir. 1979) (concluding that the trial court's finding of voluntary absence was "amply supported" where defendants were informed their presence was required, failed to appear, and never offered a reason for their absence).[5]

The district court and government's efforts to locate Monteith also suggested Monteith was voluntarily absent. The district court knew (1) Monteith was previously a fugitive for five years; (2) Monteith's ankle monitor went offline after the first day of trial; and (3) Monteith seemingly used a false name to check into his Miami hotel, where he was set to stay during his trial. Numerous attempts to contact Monteith on April 13 were unsuccessful. So, as of April 13, 2010, all available information supported the district court's findings that Monteith "very likely . . . absconded" and was voluntarily absent from his trial.

---

[5] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (holding decisions of the Fifth Circuit issued before close of business on September 30, 1981, are "binding as precedent in the Eleventh Circuit").

Information learned on the third and final day of Monteith's trial bolstered the district court's findings. Recall that, on April 14, 2010, the district court reported that probation interviewed Monteith's girlfriend. She told probation that Monteith called her following the first day of his trial and said that he was "very nervous" about trial—further suggesting Monteith fled in fear of a guilty verdict and prison time.

Monteith's suggestion that the district court made its finding "quickly" and "without specific evidence" is belied by the record. The district court and government undertook reasonable efforts to locate Monteith, and the district court's voluntary absence finding was based on substantial evidence.

Although we must focus on what the district court knew at the time it decided to proceed with Monteith's trial, *see Benavides*, 596 F.2d at 140, subsequent corroboration of the district court's finding bears mentioning here. Monteith remained a convicted fugitive for fourteen years following his trial, until his arrest in 2024. And at no point has Monteith ever argued his absence was involuntary. To the contrary, Monteith's counsel acknowledged at sentencing that "Monteith made an incredibly poor choice in not returning for trial."

In sum, the district court did not clearly err in finding Monteith was voluntarily absent from his trial.

## C.    Decision to Proceed with Trial

The district court also did not abuse its discretion in finding that the public interest favored resuming and completing trial in Monteith's absence.

District courts have "only a narrow discretion in deciding whether to proceed with a trial when the defendant is voluntarily in absentia." *Bradford*, 237 F.3d at 1312 (quoting *Benavides*, 596 F.2d at 139). District courts must consider a number of factors, including (1) "the likelihood that the trial could soon take place with the defendant present"; (2) "the difficulty of rescheduling, particularly in multiple-defendant trials"; (3) "the burden on the Government in having to undertake two trials" in multidefendant cases; and (4) "inconvenience to the jurors." *Id.* at 1313. "The district court may exercise its discretion to proceed only when the public interest clearly outweighs that of the voluntarily absent defendant." *Id.* (citation modified).

Here, the district court considered these factors and found Monteith's trial should proceed. The district court expressly considered that (1) Monteith "very likely" absconded, making it doubtful trial could continue with him present any time soon since "it took five years to get him the first time"; (2) the government's witnesses were present, including several who traveled from out of state; and (3) an empaneled and sworn jury was ready to proceed.

Monteith faults the district court for giving "too cursory a review to the burdens of a short continuance." Monteith relies on *United States v. Benavides*. There, the Fifth Circuit in 1979 found a

district court failed to adequately weigh the factors to determine whether to proceed without the defendant present. *Benavides*, 596 F.2d at 140. The district court in *Benavides* did not (1) make any inquiry "into whether or not the trial could soon be rescheduled with the defendants in attendance"; (2) consider whether a continuance would burden any member of the jury; and (3) find the government would be unable to produce witnesses at a later date. *Id.*

Unlike *Benavides*, the district court here considered the appropriate factors. The district court thought it unlikely that Monteith's trial could be rescheduled any time soon, in light of Monteith's likely abscondence. True, the district court did not find any *specific* jurors or witnesses would be burdened by, or unable to appear after, a short recess. But the district court relied on general burdens to the government, witnesses, and jurors that a recess or rescheduling would necessarily entail. We cannot say that the district court abused its discretion under these circumstances.

The district court permissibly determined it could resume Monteith's trial despite Monteith's voluntary absence. Monteith waived his right to be present and, therefore, suffered no infringement of his rights under Rule 43 or the Constitution.[6]

---

[6] Because we conclude the district court did not err, we do not address arguments regarding harmless error.

## VII.  SENTENCE

### A.    Obstruction under U.S.S.G. § 3C1.1

On appeal, Monteith argues the district court erred in calculating his total offense level when it applied a two-level obstruction increase pursuant to U.S.S.G. § 3C1.1.

Section 3C1.1 of the Guidelines provides that a district court may impose a two-level increase if:

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense . . . .

U.S.S.G. § 3C1.1. The Application Notes to § 3C1.1 state that the increase applies to conduct involving "escaping or attempting to escape from custody before trial or sentencing; or willfully failing to appear, as ordered, for a judicial proceeding." *Id.* cmt. n.4(E).[7] "'Willfully' means the defendant consciously acted with the purpose of obstructing justice." *United States v. Perkins*, 787 F.3d 1329, 1341 (11th Cir. 2015) (quoting *United States v. Massey*, 443 F.3d 814, 819 (11th Cir. 2006)).

---

[7] Neither party disputes the commentary's validity or interpretation of the guidelines text, so we need not delve into issues regarding the commentary's role vis-à-vis the guidelines' text. *See, e.g.*, *United States v. Mullings*, 166 F.4th 939, 953 n.5 (11th Cir. 2026).

The district court based the application of § 3C1.1 on Monteith's decision to abscond during trial, which caused the case to be tried in absentia. Having already affirmed the district court's finding that Monteith was voluntarily absent from trial, we discern no error in the district court's finding that Monteith's conduct constituted willful obstruction. Monteith attended the first day of his trial but thereafter "willfully fail[ed] to appear, as ordered, for a judicial proceeding," making application of § 3C1.1 appropriate. U.S.S.G. § 3C1.1 cmt. n.4(E).

Monteith maintains that § 3C1.1 does not apply because "there was no specific order commanding his presence at the trial." That characterization ignores the clear import of the district court's orders and communications. The district court's scheduling order set Monteith's trial for Monday, April 12, 2010. Although the order did not expressly command Monteith's presence, the combined effect of the order, Monteith's bond, the Constitution, and procedural rules, required Monteith's attendance at trial. *See* Fed. R. Crim. P. 43 (providing a defendant generally "must be present at . . . every trial stage"). Monteith and his Georgia-based, federal probation officers seemingly shared that understanding, as Monteith was allowed to travel to Miami and appeared for the first trial day. At the conclusion of that first day, the district court told the parties that trial would resume at 10:00 a.m. the following day, with no suggestion Monteith was permitted to skip out.

The district court interpreted its communications with Monteith similarly. After Monteith failed to appear, the

government asked the district court or defense counsel to "make clear on the record, that [Monteith] was in fact advised and knew that . . . his presence *was required* here today." (emphasis added). The district court answered affirmatively: "Well, I told him. I mean, he was here when I said yesterday afternoon that we were going to resume at 10 a.m. this morning. He was in the courtroom present." Monteith's counsel shared the district court's view, having told Monteith to be there at 9:30 a.m. the next day. It strains credulity to suggest Monteith did not understand the district court to have ordered him to appear on April 13, 2010.

Monteith also contends § 3C1.1 is inapplicable because "his failure to appear on the second day of trial did not obstruct or impede the proceedings." We disagree. Monteith's conduct caused the district court and government to undertake significant efforts to ascertain his whereabouts. They conferred with Monteith's girlfriend and his probation officers, who in turn conducted additional investigations. The jury had to wait several hours that morning. Thus, Monteith's voluntary absence obstructed or impeded trial proceedings in the district court. Even assuming arguendo that Monteith's trial was not actually obstructed or impeded, his flight would nonetheless qualify as an attempted obstruction or impediment to which § 3C1.1 applies.

Additionally, § 3C1.1 rather clearly applies for a reason not relied on by the district court. *See United States v. James*, 135 F.4th 1329, 1332 (11th Cir. 2025) ("This court may affirm a sentencing enhancement for any reason supported by the record, even if not

relied upon by the district court." (citation modified)). Monteith's willful flight from his trial and stint as a fugitive prevented his sentencing for fourteen years. By its plain terms, § 3C1.1 applies when a defendant willfully obstructs or impedes *his sentencing. See* U.S.S.G. § 3C1.1 (requiring a two-level increase when a defendant "willfully obstructed or impeded . . . the administration of justice with respect to . . . *sentencing*" (emphasis added)). Section 3C1.1 patently applies to Monteith's conduct.

## B.    Substantive Reasonableness

Monteith also argues the 108-month sentence is substantively unreasonable.

Determining the substantive reasonableness of a sentence requires us to look at the "totality of the circumstances." *United States v. Grushko*, 50 F.4th 1, 19 (11th Cir. 2022) (citing *Pugh*, 515 F.3d at 1190). In imposing a sentence, the district court must consider all the factors set forth in 18 U.S.C. § 3553(a), "but it may give greater weight to some factors over others or even attach great weight to a single factor." *Id.* (citing *United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015)).[8] The defendant

---

[8] The § 3553(a) factors include: (1) the nature and circumstances of the offense and the defendant's history and characteristics; (2) the need for the sentence to reflect the offense's seriousness, promote respect for the law, and provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with education or vocational training or medical care; (6) the kinds of sentences available; (7) the sentencing guidelines range; (8) pertinent policy statements of the sentencing

bears the burden to prove his sentence is unreasonable. *Id.* at 18. We will vacate a sentence only where we are "left with the 'definite and firm' conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that is outside the range of reasonable sentences dictated by the facts of the case." *Id.* at 20 (quoting *United States v. Irey*, 612 F.3d 1160, 1190 (11th Cir. 2010) (en banc)).

Given the advisory guidelines range of 87 to 108 months, the § 3553(a) factors, and the totality of the circumstances, Monteith has not shown his 108-month sentence is substantively unreasonable. At trial, the district court heard evidence that Monteith (1) partook in a conspiracy to import a large quantity of cocaine into the United States; (2) avoided arrest for around five years following his indictment; and (3) was previously convicted for possession with intent to distribute marijuana. The district court also considered Monteith's failure to appear for the second day of his trial, and the subsequent fourteen-year period during which Monteith remained a fugitive.

Although this Court "do[es] not automatically presume a sentence within the guidelines range is reasonable, we ordinarily expect a sentence within the [g]uidelines range to be reasonable." *United States v. Hunt*, 526 F.3d 739, 746 (11th Cir. 2008) (citation

---

commission; (9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to victims. 18 U.S.C. § 3553(a).

modified). That Monteith's sentence is within the advisory guidelines range further indicates his sentence is not unreasonable.

Monteith suggests the district court did not properly weigh "substantial mitigating issues" in his history, such as his difficult, impoverished upbringing and worsening health. But Monteith ignores that the weight to be accorded each § 3553(a) factor is "a matter committed to the sound discretion of the district court." *United States v. Ramirez-Gonzalez*, 755 F.3d 1267, 1272 (11th Cir. 2014) (quoting *United States v. Amedeo*, 487 F.3d 823, 832 (11th Cir. 2007)). It is not for this Court to reweigh the § 3553(a) factors. *Id.* at 1273. We cannot say the district court committed a "clear error of judgment" in more heavily weighing the offense conduct and Monteith's obstruction to arrive at a 108-month sentence.

Given the record as a whole, Monteith has not shown that his 108-month sentence is substantively unreasonable.

## VIII.  CONCLUSION

We **AFFIRM** Monteith's conviction for conspiring to import a mixture containing between 500 grams and 5 kilograms of cocaine and his 108-month prison sentence.

**AFFIRMED.**